Good morning, Justices. Brian Gaffney for Plaintiff Appellant, Pacific Rivers Council. This is a case that arises from the US Forest Service approval of a supplemental environmental impact statement for the 2004 framework that affects all of the 13 national forests through the Sierra Nevada, a plan that will have immediate effect upon its approval. And our challenge here is to its compliance with NEPA, National Environmental Policy Act. Our challenge is both to its analysis of impacts, direct impacts, its analysis of the whole of the project, or cumulative impacts, and its analysis of mitigations. In regards to the direct impacts, our challenge is that under NEPA, the standard is whether or not it was the agency took a hard look at the environmental impacts and whether or not it was reasonably possible for them to do so, given what was known about the species and the project. We focus in particular on whether or not there was a proper analysis of the direct impacts of logging, burning, and grazing on fish and amphibians, or what we call aquatic species. Our first point is that it was reasonably possible for the agency to take a hard look. They knew- May I interrupt you a little bit? Please. As I understand it, this is a programmatic plan. Yes, Your Honor. And under a programmatic plan, it's a little bit different than the normal plan in that you don't have to have the detail that would be necessary to have these other plans. And so what is my standard when you say there are other things they could have looked at? What is my standard that I have to review this plan under for determining whether it's an appropriate programmatic plan? The broad standard is whether or not the supplemental environmental impact statement fostered informed decision-making, and the two prongs that the Court will look at in determining that are whether or not the environmental problems were apparent at the time that the programmatic environmental impact statement was done, and whether or not the program contained enough specifics to permit productive analysis. Right. We're not looking for the level of- Go ahead. We're not looking for the level of detail that one would see in a site-specific timber harvest plan. But nevertheless, simply because it's a programmatic analysis, then the agency doesn't get to either defer the analysis till the site-specific, nor do they get to- But they don't have to make any decisions in this particular plan. All they have to do is make out general guidelines about where we're going, correct? The program would lay out the guidelines as to what they were going to do. The environmental document would look at the analysis of what the impacts of that plan would be. So, for example, one of our contentions is that there was no analysis of the impacts on the biological processes of the fish. There's numerous fish throughout Sierra Nevada. I can list them, but I'm sure we'll take that as granted. And what the agency did here was that it looked at the geomorphic sedimentation, for example. What's geomorphic mean? How hillsides slide down, and how the earth changes, and how the geology changes, in simplest terms. But having done that first step, then they didn't say, therefore, this will be the impact on the species. In fact, as regards to fish, there's not a single fish species that's used as a focal species in the environmental impact statement. How much do we know about what the Forest Service knows as to where this work is going to take place? The logging, and the grazing, and so on. And how much do we know about what the Forest Service knows about, in order to do this logging, where the roads are going to be built, and so on? Yes. The Forest Service seems to say, we don't know much at this point. And all we can tell you is that, you know, basically, dirt in the stream is bad for the fish. And so there's two answers to that. One is that what the agency knew when it did this supplemental environmental impact statement. They knew the levels of logging in each national forest. They knew that logging, and they can see that logging is related to roads. They knew the number of miles of roads. They actually had maps that showed the location of where the logging was going to happen. They also knew the number of grazing allotments that were going to happen. So they had the specifics, and we cite this in our briefs. They had the specifics to know. It was not simply a generalized, oh, we might do something later. They actually laid out what the level of logging, and roads, and grazing was going to be. I want to make sure that I'm following. So if they know, more or less, the number of board feet that are coming out of Forest X over the next decade or so, under the new 2004 framework, and they know, more or less, where the roads are going to have to be if they're going to take that amount of board feet out of the forest, do they also know what streams they're going to go past and what fish are in those streams or what other aquatic animals are in or around those streams? They also know where the range of the animals. This leads to the second point, which is there was a 2001 framework and an environmental impact statement for that program. Our other point regarding reasonably possible is this same agency did the level of analysis that we say is missing here back in 2001. In 2001, they did an overlay where they looked at the logging, they looked at the grazing, they looked at the species, and they made determinations as to the likely environmental outcome for the specific species. That's our other point as to whether or not it was reasonably possible. They did it before, so clearly it was reasonably possible for them to do it here in 2004. When they did it in 2001, they acknowledged at the time that they were doing it that they didn't know the specific locations of what they call vegetation treatments, of the logging, and yet they did what NEPA required. NEPA, the case law, as this court knows, says that even if there's uncertainty, that under NEPA, some speculation and forecasting is expected from the process. They did that in 2001, but for the change in 2004, they failed to do so. The other point that we make is that- If they knew all of this information, which I tried to- I can't say I know the record as well as you because I'm focused on it, and every time I'm on an environmental case, the focus is so big that I'm not sure I get to where you get. It seems to me that they've made certain fundamental decisions in certain areas, as you suggested. I guess I'm wondering, given that, did you know that when you filed the complaint? Pacific Rivers Council had commented on the plan and had reviewed the draft and commented on the draft environmental impact statement. Did you know all of the facts and information that you've answered when you've answered to Judge Fletcher's? I did not specifically, Your Honor. I wasn't involved at that point. But did your people? Did Pacific Rivers Council know? And I believe that it was included in their comments, yes. Well, I guess my worry about that is this. If that is so, then if the Forest Service is alleging that you have no standing, in looking at your complaint, where do I find the specific injury you needed to plead in order to find that standing pleading? Right. So, under Lujan, standing is established at each stage of the litigation. That's exactly true. And so, in our complaint, at paragraph 13, Pacific Rivers Council states that members of Pacific Rivers Council use and recreate in the Sierra Nevada National Forest affected by the 2004 framework. And at paragraph 15, Pacific Rivers Council alleges that the 2004 framework and the supplemental environmental impact statement has harmed and injured and will continue to harm and injure their interests by causing irreversible harmful effects to the Sierra Nevada National Forest and the imperiled species that depend on these forests. So, you're really saying, then, that that language there, in the Sierra National Forest affected by the 2004 framework, that's your allegation suggesting you've read the particular documents about what the Forest Service is going to do in the Sierra National Forest and you are affected by them? Yes, Your Honor. And at the notice pleading stage, for purposes... Because I'm looking for a place in the complaint where, one, the Pacific Rivers Council, if you will, has suggested that they are in those places affected. And for purposes of the notice pleading, we allege that we were... Well, the only thing I saw is that the members use and recreate in forests affected by the framework. That gave me no idea. I mean, the whole forest is affected by the framework. And this is a programmatic document that will affect 13 national forests from north to south, up and down the Sierra. The issue that was raised in the opposition brief by the agency for the first time is the issue of standing. It was never raised at the trial court level. Well, I understand that, but that doesn't really concern me so much because it just means a different standard to review. It means that you get away with not having declarations about certain things, but the complaint has to make generalized allegations in the affected areas. And I guess I'm trying to figure out, if we don't even know what the particular projects are, and how I can suggest that your members are affected by those projects. Well, we think we did meet that standard, Your Honor, respectfully, in that we allege that we're affected by the... that we use each of the Sierra Nevada National Forests at issue and that we're harmed by the plan to the national forests and to the species that we're interested in. The geographic specificity that the agency points to arising from the Summers case out of the U.S. Supreme Court, there, as the court probably well knows, there was a challenge to a notice and comment regulation and a specific timber harvest plan. The specific timber harvest plan was settled. And then all that left was the Supreme Court saying, we can't tell where, if at all, there's no declarations. And there are a number of distinctions that we withdraw. One is that the issue of standing had been litigated at the trial court level. Well, I understand that. But we have quite a few cases that would suggest that. We don't have a problem if it's not litigated at that level. The standard just changes. And then, I guess, what I'm really worried about is, from reading your complaint, how I determine that your people are using those parts of the forest that will be affected when I don't even know what parts of the forest will be affected. I mean, it's a little tough for me to suggest that there's some injury by your members of your organization if I don't even know what projects are going to be yet or where they're going to be yet. And I don't, therefore, know whether your people have been involved in that area of the forest. And for purposes of a challenge to a programmatic environmental impact statement, we point to Citizens for Better Forestry where the Ninth Circuit has found standing to a challenge to a programmatic plan where the- Decided after? No, decided before Summers. That's right. But we don't think that Summers changes that standard as far as either the notice pleading that's required for purposes of the complaint. And we also think that Pacific Rivers Council did provide, for purposes of notice pleading, adequate demonstration of harm by saying that it was affected in each of the national forests. To follow up on Judge Smith's question, how specific do you have to be in terms of standing, given the nature of this 2004 framework, as to what particular parts of the forest your members are going to be in? The reason I ask it that way is that this framework obviously covers a very large number of national forests, pretty much the entire Sierra Nevada, and we can see from various things in the record the amount of logging that's going to take place in these national forests. It looks like you're going to be logging in every one of the national forests that are part of the framework. How specific does your client or the members of your client have to be as to wanting to be in this one or that one when all the national forests are going to be affected? I don't think that we have an obligation to lay out specific projects in the complaint that we're going to be adversely affected by. Well, I'm not sure we have very many specific projects at this point, given the nature of the framework. Exactly. When the time the 2004 framework was adopted, they included levels of logging that they would permit, but did not have within the framework, aside from the Quinsley Library Group projects, specific areas. We do allege that we use and recreate each of the national forests that will be affected. Does the court have a question? I mean, my worry, I've already put out there for you, because I know we have to look at the complaint, so that's why I was trying to make sure. If one knew the general areas in which the Forest Service was going to make the added, if you will, intrusion into the forest, and then one knew what the situation is, it seems to me one could have easily pled that one had members which were involved in those particular areas. They were, in fact, fishing, well, all of the kind of things that you say, hiking, backpacking, photography, et cetera, in those particular areas, which I didn't find here. So I, again, even giving you the good standard, I had a tough time. And I don't think that that's required, because if one looked at the plan, and what the plan said and what the environmental impact statement that we commented, the Pacific Rivers Council commented on, was what we pointed out to, it was an absence of analysis as to the impact on the fish and the amphibian species from the broad programmatic document that was approved and not from particular logging in spot X or Y or Z. Well, but the Supreme Court isn't going to let anybody who is worried about fishing or those kind of issues that you are just come in and attack that. If I look at Lujan, I can't get there. I've got to have somebody who has a particularized interest in that particular area with particularized injury. And in addition to the complaint, we also, even though the issue was not litigated at the summary, at the trial court level, we also have the Anderson Declaration where he says that he lives... We're really not on the Anderson Declaration unless you want to go there, because they didn't raise it in the district court. If you want me to go there, I'd be glad to go. But I'm trying to give you the benefit of the doubt. They didn't say anything in the district court. I've got to look at the pleading. That's it. And we think that the complaint meets those standards and that we think Citizens for Better Forestry is still good case law, that plaintiffs do have standing to challenge programmatic documents. And moreover here, the interest that plaintiffs have in the particular species is not simply an interest in a particular tree. These are animals with ranges. And the fact that we've alleged that we'll be harmed in each of the national forests and that we'll be harmed to the particular species that we have an interest in we think is sufficient. I didn't mean to steer us to standing away from the big issues. I see I have one minute. Should I save that for reply or is there more we should address here? Reply sounds good to me. Good morning. May it please the Court, Jennifer Newman for the Forest Service. This Court has to start with the fundamental question of whether or not it has Article III jurisdiction over the plaintiff's claims. And both at the pleading stage and in the declaration that's submitted in the district court, Pacific Rivers did not show that it has this sort of particularized injury from activities authorized under the 2004 framework that the Supreme Court requires. Now, is that because we don't have allegations in the complaint that members of the organization use the Sierra or is it because at this point the programmatic statement is so vague that we don't know what's going to happen? It's because the allegations in the complaint are insufficient. That was not the answer to my question. I'm giving you two choices and you can say either one or the other or you can say neither and you can give me another one. I'm asking you is the problem because we don't have sufficient allegation that members are using the National Forest subject to the framework or is the problem that the framework is so vague that we don't know what's going to happen? It's the former. The problem is that the allegations that the plaintiffs made about their use of the National Forest are too vague to meet the standard established by the Supreme Court. I'll just read the complaint. PRC members use the Sierra Nevada National Forest, plural, for a variety of purposes, including but not limited to hiking, backpacking, photography, scientific study, wildlife observation, spiritual nourishment, hunting, and fishing, I guess corporal nourishment. What should they say in addition? They need to say that there are specific projects that are authorized under the 2004 framework that are actually going to harm those interests in the areas that they visit. So it sounds like your answer is number two, that is to say that this is so vague that we don't know what's going to happen. That would be true if this were, say, six months or a year maybe after the 2004 framework was created and became the governing standards by which these forests were governed, but that's not the case. There have been projects that have been authorized under the 2004 framework, and Pacific Rivers has never come forward to say that any of its members use any of those areas. And I want to contrast this. Why should they have to do that if they didn't have to do it when the framework first came out, which was the premise of your answer? If they had... That is to say you're saying, and you may want to back away, but as I heard you say, they did have standing with this allegation when the framework first came out, but as soon as individual projects started happening, they don't have standing anymore. Is that what you meant to say? No, that is not what I meant to say, Your Honor. They wouldn't have had standing at the point where the framework came out. I understand why you might have been confused. I was not very clear because they didn't have... You're saying there is no standing to challenge a programmatic EIS? In the situation that we have here where the allegations that the plaintiffs are making are all related to future projects and the programmatic document itself does not have immediate effect on the plaintiffs, then yes, they do not have standing because they have not suffered sufficient injury in fact. But doesn't your answer really lead us, and this is the one that's most baffled me, to the idea that one can never challenge then the programmatic plan because if you're suggesting that some project has to be in motion or something has to be done, I'm trying to figure out the time or the purpose or when one could challenge the programmatic plan under Lou John as you would argue it. I mean, I can't find it. I mean, I tried to go with where you're going on your standing argument, but I'm having a tough time finding who the plaintiff could ever be for the programmatic plan. Well, I have a very good example for you, Your Honor, and that is the other case brought by environmentalists against the 2004 framework. In that case, the plaintiffs identified four specific projects in the Plumas National Forest that they alleged would harm their members' interests. So that is one way to go about it. At that point, whenever there are specific projects that might injure a plaintiff, then they are free, as the Supreme Court has said in Summers, to attack that broader programmatic document to the extent that it's causally related to their injury. Let me ask you one more. And if they challenge after they know what the projects are, then the 2004 plan is already implemented. How will they ever get a chance to challenge on the 2001 plan? I mean, they really want to challenge the change from 2001 to 2004. Right. If we have to wait for a project and you've already implemented the 2004 plan, how does one ever get the challenge to the 2004 plan itself to go back to 2001 under your analysis? At the time that there is a project that's coming up that is going to injure the plaintiffs, they can raise all of the same arguments that they are trying to raise here, assuming that they're relevant to that particular project. I mean, for example, here we've got grazing and timber projects at issue. And so if it's a grazing project, they can bring all of their grazing arguments about the alleged inadequacies of the agency's analysis in the Supplemental Environmental Impact Statement at that time. Let me back up to the underlying legal requirement that the Forest Service has to comply with here, and that is to say under Kern, they've got to analyze all the environmental impacts that are reasonably foreseeable or reasonably possible to foresee at the time that the framework comes forward. You can't put off until the last possible moment analyzing the environmental impacts, for example, at the project stage, if you could reasonably be expected to analyze and you knew enough at the framework stage. But you're saying that the framework stage is essentially unenforceable until you get to the specific project phase. That does not sound to me as an appropriate implementation of the requirement in Kern, because there's no way ever to insist that a programmatic statement comply with NEPA. I disagree, Your Honor. Why do you disagree? Because I think you've just told me that you cannot bring a challenge to a programmatic statement. You have to wait until the project goes, and then you can do it. Yes, that's right. You can bring the same exact challenges to that programmatic document as long as it is in the context of a specific project that's actually injuring the plaintiff. Do you have any case law that says that? Because we've got a lot of programmatic statements in our earlier case law that says you can challenge the programmatic statement. You don't have to wait for a specific project. Do you have a case that tells you that that case law has been overruled? Somers, it seems to me, doesn't quite get there. That's notice and comment under an entirely different statute. I don't think that the statute matters, Your Honor. What Somers said was that in order to have the constitutional minimum injury in fact, the plaintiff must allege this concrete, particularized injury. And then, of course, at the summary judgment stage, it must prove it. But there, it was there. In Somers, it was concrete alleged, concrete, individualized, particularized injury from failure to – from not being able to have notice and comment. And the court says, we just don't see that that failure to have notice and comment had any effect on you at all. That's not really what's going on when we're talking about a programmatic EIS that has a lot of effects because it sets up the way the planning is done in the future. It sets lots of things in motion. In fact, I was quite convinced by it. Judge England, in the other case where he went back, he said, you know, lots of money and time is invested based upon the programmatic EIS or the programmatic ROD because we go forward from there. Somers has a lot of impacts. I think that Even before you get to the individual project that you're now asking, say, the only one we can challenge. Your Honor, there are no on-the-ground impacts that could injure the plaintiffs here until there is a specific project that has been authorized by the 2004 framework. And unless they point to this court As I understand it, then, there is simply no way for an environmental group or an environmentalist using the CIRA to challenge a programmatic EIS, period. As long as all you have is the programmatic EIS, it's insulated from review because of Article III. Yes, that is correct. And assuming that the program itself Do you agree that that position you've just taken is inconsistent with our prior case law? I do, Your Honor. But I think that Somers changes that. I think that Somers just overrules all that stuff. I think that it does. I think it requires that sort of level of concrete, particularized injury to that individual plaintiff. And I have to say, this is not just a matter of some sort of academic exercise for the courts. There's real meaning behind the requirement for there to be a particularized injury to the plaintiffs. Take, for example, in this case where you've got the plaintiffs attempting to challenge these broad bounds that the Forest Service has placed on its future decision-making authority, it might very well be the case that some of those outer limits are never going to matter and therefore never injure the plaintiffs in the way that they care. Now, you've got a lot of things to cover. I'm changing gears. I'm reading to you from ER 140. It's the beginning of this framework EIS. It's in page 5 of the summary. I'll just read to you. Opportunities in the proposed action. Opportunities are also provided to allow for generation of byproducts. Byproduct production would offset the cost of fuels treatment and allow the desired program-level acreage of hazardous fuels to be treated. What does that mean? Basically what it means is that under the 2001 framework, it relied a lot on actions that the Forest Service would take itself, doing prescribed burns and that sort of thing in the forest to try to manage for wildfire risk. And under the 2004 framework, more emphasis is placed on actually removing trees from the forest and allowing private contractors to do the sort of work that the agency feels is needed to manage that wildfire risk. What does generation of byproducts mean? Again, saw logs, biomass used for energy production. Those are the byproducts. After a lot of work, I think I translated it, and I translated it a little bit differently from the way you did. As I translated it, it is that S2, the alternative preferred by the Forest Service, allows a lot of logging. The Forest Service can make money out of the logging, and with that money it can pay for the fire suppression efforts or the treatments it wants to do. Is that what that says? No, that's actually not what that says, Your Honor. What the agency is talking about with the funding of the projects... Let me read you the second sentence then. Byproduct production would offset the cost of fuels treatment and allow the desired level acreage of fuel to be treated. That sounds as though byproducts is money generation for the Forest Service. It's not money generation for the Forest Service directly. It is making the activities that the agency wants to carry out profitable enough that private industry is willing to come in and do the projects. That's what that's talking about. I think you and I are finally then to the same point, although you're still not saying it as plainly as I might like it. The Forest Service makes money by letting out the logging contracts, and with that money it's able to offset the cost that it otherwise would have to bear for the treatment for the fire suppression. That's actually not true, Your Honor. What happens to the money that comes from the private contractors bidding on the projects is that most of it is returned to the Treasury, as it's required to be. Some of it is paid to the individual communities to help pay for schools and things like that, and then some of it the agency gets to keep for very, very limited things to do restoration work in the area that has been treated. So it's not a money generator in the sense that the agency gets to go out and hire more foresters or anything like that. That is where the money goes, and what the agency is talking about in that sentence that you're reading me is really about making the projects profitable enough so that you can get private industry to come in and do them rather than have individual Forest Service personnel do them. The reason I'm belaboring this is that I've read an awful lot of this. I've not read all 1,500 pages or whatever it is, but I've read an awful lot of this. In parts of it, it's crystal clear, and in parts of it, it seems to me deliberately obfuscating, and this seems to me deliberately obfuscating. I don't know whether you're trying to hide from Judge Noonan or not. You didn't succeed, because he's obviously got to be in his monitor. I sat on another case with him. I don't join Judge Noonan's concurrences on those points and so on, but this looks to me as though, Judge Noonan, please don't read this carefully. What I'm really worried about is, with respect to this, assuming standing, and you do not have to concede standing, assuming we can actually get to the merits of the challenge here, the more I read, the more it is apparent to me that the Forest Service actually knows quite a bit about what will happen. For example, they've got, later on here, they've got statements as to, I'm now on page 454 of the ER, but it's Alternative S-1, which is to say basically the 2001 framework, compared to Alternative S-2. In Decade 1 for S-2, and in Decade 2 for S-2, they'll say, by forest, how much projected annual green timber harvest volume by national forest, and we run through every national forest. They predicted very precise numbers, down to 14,819 feet for the Sierra National Forest. So, the Forest Service has a very clear idea as to how much wood they expect to be taking out of there. We've also got very precise predictions about the number of new roads that are going to be built, assuming in order to carry out this logging and for fire suppression and so on. But despite the very clear evidence that you know all these things, you can't manage to say anything precise about the impact on the fish and the aquatic species. All you say is, you know, you get stuff in the streams and it's not good for the fish. And the reason for that is, despite the fact that the agency estimated the maximum amount of timber that would come out of each forest, it was, in fact, only an estimate. It doesn't say maximum, it says projected. Well, it does say projected, though, which means an estimate. The agency doesn't know for sure, and more importantly, it doesn't know where in the forest those treatments are going to be. Now, I know that Pacific Rivers has... You know, I have to say that if they can tell me that coming out of the Sierra National Forest, that 14,819 board feet are going to come out, I cannot imagine that they have no idea where that's going to come from. They have certainly said that they want to emphasize areas that are closest to communities, because that's important for wildfire risk reduction, but this document does not make the decision of where precisely those treatments are going to be. We are talking about vast areas, and yes, it may sound like a lot of timber coming out of there, but unless you know which streams are being crossed, whether or not there are species of concern in those areas, the agency has done what it needs to do... has projected without having any idea where it's coming from. Your Honor, I don't know the precise math that they used. I assume that they did some sort of modeling, considering how much they projected they needed to do to reduce wildfire risk, but the question is, does this document decide where the timber treatments are going to be? And the answer is, it simply does not. They may not make a final decision, but they've got a pretty good idea of what's going to happen. You know, if you say that, I don't know, that figure that Judge Fletcher just read you, that doesn't... It's not as if there's one big fire that's going to consume all these fires. They must have some pretty good idea of where this is coming from in order to get that kind of a figure. The... Yes, clearly they made estimates, and they used those estimates about the amount of timber logging and vegetation management and grazing to come up with the analysis that they did in the species analysis, talking about what could be expected as far as impacts to individual species. That is at the appropriate level of generality, given what the agency knew about the projects that were likely to be authorized under the 2004 framework. How do you respond to the argument on the other side that in the 2001 framework, there was much more detail down to specific areas as to likely environmental consequences? And he says, well, if that was reasonably possible in 2001, why isn't it reasonably possible in 2004? I've compared the two documents, the 2001 final environmental impact statement and what the agency prepared in 2004, and if you look at them, the analysis of what's going to happen to the species is not really any different. Now I confess I have read the 2004. Is the 2001 in the ERs that I've got in front of me? There is, I believe, in the supplemental, in excerpts that the plaintiffs submitted, there are parts of the 2001. Only parts? Well, the parts that plaintiffs thought were most relevant to this particular question. But I assume not just the ERs, but in the record as a whole, I've got the whole thing? No. No, right? You don't. Not even in the record as a whole, I don't have it. I didn't have it, all of 2001. No, there are only parts. Okay, so I'll make do with what I've got, okay. The worry that I have is that as I understand it, the Forest Service violates NEPA when it fails to take a hard look on the framework. And I guess the impacts on the fish and the amphibian species are my biggest worry here. I guess I'm trying to figure out. I don't see very much analysis on the impacts of grazing policies or road projections on those species. Where do I look for this kind? I mean, I realize it's a broad view, and I realize it has to be a broad view, but I'm looking for something where the Forest Service says, okay, we've got these fish, we've got these amphibian species, and these are the things that we ought to do. And I guess given even the broad view that comes from these kind of things, where do I find the information? Not that they say it's bad or it's good, but they've looked at it and put it out there so somebody can make a specific recommendation. Well, if you look in the analysis of the individual species and the effects, including cumulative effects on those species, you will find the agency talking about, you know, is the habitat for the species fragmented? What will happen to that species? Are prescribed burns important for them? Do they pose a risk to the species? That is all in the species-by-species analysis. And, you know, the question, I think, is what Your Honor hit on, which is does this document foster informed decision-making by the agency and by the public? Is there enough there, given what the agency is actually deciding in this document, to have that decision-making be informed? And I think that the answer to that question is yes. The agency did what it could. It did what was reasonably possible whenever it was analyzing these effects in these various areas. And they are going to be analyzing this site-specific effects with respect to future projects. And given that state of affairs, what the agency has done here is adequate underneath that. This may be down too much into the detail and the specifics, but there's general talk about things that can be done, for example, in road building for new roads or road reconstruction that might mitigate. But I'd never get past general. Now, for example, does that mean that they're going to have catch basins for when the sand and gravel washes off the logging road toward the stream so it doesn't get to the stream? That depends on the condition in the particular area where the road is. What is the soil condition like there? What is the condition of the stream? How are they building the road? That's when the question of is there a catch basin would be answered. Do I know that if the conditions are appropriate, that they will put in a catch basin? I see nothing in here that guarantees there will ever be any catch basin. That's right, because there may not need to be a catch basin. That is a question that has to be analyzed. That's going to be, I'll say, I can't quite say wrong, because need is a question of compared to what, but we know from logging roads that there's a lot of debris. It's going to be sand, little bits of gravel and so on that wash from the road down into the stream if it's anywhere near the stream. We just know that. If you don't put in a catch basin, is it going to go to the stream? Your Honor, I think that there are other standards and guidelines that address this question. For example, there are riparian buffer areas away from the streams that in part mitigate this concern. Then the agency is going to look at the site-specific level. Where exactly do we want to put this road? Maybe we should put it further away from the stream. Then there's never a need for a catch basin. If it's close enough, then the agency is going to analyze that question. If Pacific Rivers thinks that the agency did it incorrectly and is missing catch basins that should be there, they certainly have an opportunity at the site-specific stage to come in and challenge that decision by the agency. This court can review it. Does this mean that every single thing you do to implement this whole Sierra project, each action will have a new EIS? Some of them might be done on environmental assessments, which is a less detailed document, and those are for projects where the agency determines that there's no significant impact on the environment. But then you're right back in the soup with cumulative impacts because if you say, well, this was just 50 acres, and the EIS says there's not enough, well, I say, but if you're going to do this 10 times over, that's a real impact. I mean, the whole approach is you have to do as much as reasonably possible is designed to say, you know, if you can decide things on a large scale, do it. And at the moment, you've given us virtually no information from which to know how you've done this on the large scale. I just want to make the point with respect to cumulative effects, even if the agency decided to do an environmental assessment, they would still, under this court's case law, be required to look at the cumulative effects of the nearby projects and examine that in the site-specific document. Yes, I know they would. And so given that requirement later on in the process, before there can be any effect to anyone, the level of detail that's provided here, again, given what the agency knew, is sufficient. This just strikes me as if you can't bring a challenge here, there's no standing, and if you can bring a challenge, that there's enough here, even though there's absolutely no indication as to where the roads are going to go and no indication as to where the trees are going to get cut down, even though you can tell me exactly how many board feet are coming out of there. This is... It strikes me that a fairly sensible system that says, do as much as you can at the general stage, which then makes it more efficient when you get to the particular stage, you're pushing everything to the particular stage. That does not seem to me the way NEPA is designed to operate, nor does it seem a very efficient way to operate. Your Honor, the question is, of course, not whether it's an efficient way to operate, but whether NEPA requires the agency to do more than it did here. Well, you said it's not what NEPA contemplates, and it's also, in addition, not very efficient. That is correct. Maybe that second one isn't our function to make this government efficient, but it's worth mentioning to you, since you're here representing the government, that if you don't follow NEPA, you not only violate the law, but you're acting in an inefficient manner, is what I understood Judge Fletcher to say. And with all due respect to the Court, I think that the agency here is complying with the structure that NEPA requires. This is exactly what it contemplates. It contemplates that there will be different levels of analysis at different stages of the decision-making process, and the only question for this Court is, assuming that the plaintiffs have standing, which, of course, we think they don't, but if they do, then is the level of analysis within the 2004 framework sufficient, given that there will be more analysis coming later? Or did the agency really have to do more at this stage? And really, was it possible for the agency to do more? The agency explained why it couldn't do more, and, you know, was that an incorrect conclusion? Thank you. Thank you. I'll keep my arguments brief. The 2004 framework needed to have robust NEPA analysis now because it did predetermine effects. For example, where there was going to be fuels treatment, previous to 2004, the bottom third of each hillside would not be burned or cut. That restriction has been eliminated. Where there was going to be fuels treatment, which means controlled burning to stop the risk of fire to human populations, before 2004, 10% of the land base would not be burned. After 2004, that restriction was removed. Prior to 2004, there were no grazing that was to be allowed in Yosemite Toad unsurveyed habitat. Upon 2004 becoming effective, that limitation was lifted. So there were immediate effects that came about because of the 2004 framework, even if they didn't know exactly where the logging was going to happen. We also point out to the fact that there was supposed to be a landscape-level review within five years, that there was a 2004 soil compaction standard which was eliminated, even though they said that that 2001 soil compaction standard was going to, the effect was going to alter the stream structure. So there were immediate effects. This 04 framework will predetermine the future. They will permit greater logging, and they knew exactly, they had maps that showed that general areas that were going to allow the logging, and they knew, as Justice pointed out, the exact levels of timber they were going to have come out of there. Because they knew enough, and because they were able to do it in 2001, it was reasonably possible for them to do analysis here, and what they had here is no examination of the impacts on the biological process on fish, and for the aquatics, it's repeatedly deferred analysis to the site-specific level. Going back to the standing argument, it's crystal clear that what the government intends to argue here is that there can be no challenge to NEPA for programmatic documents, and that's completely not supported by Summers whatsoever. On one hand, they said that we had to provide a greater level of specificity as to where exactly the logging was going to be, but in response to the court's questions here today, the only response they can give is there's vast areas, and we don't know where the logging's going to happen. That's going to be determined later. So it's a double standard they're imposing upon us. For that reason, we feel that they've not complied with NEPA, and the determination of NEPA compliance should be set aside. Okay. Before you sit down, and again, this is not a strong rebuke, but I have to say that as I read through your blue brief and then I would go to the parts of the ER that were referenced, oftentimes I couldn't find what you referenced on the page you sent me to, and you may have an explanation for this. I'm now on page 11 of your brief. The DSEIS was criticized by the Forest Service on Science Consisting Review Team. Then there's a block quotation. The DSEIS is clearly a different philosophy of risk, da-da-da-da-da. That looked to me like that's a statement from somebody in the Nature Conservancy. I apologize if the court in any way could not find what we were citing to because we did put a great amount of effort to checking and double-checking that. We certainly in no way misquoted what an agency said. The quotation's accurate. It's just a question of who it gets attributed to. And the page that we referred the court to, you couldn't find it on that particular page. Oh, I found it, but I found precisely that quotation. This is different from I couldn't find it on the page. This is, again, a different problem. This particular passage that you quote, and you send me to the right page, this does not appear to come from the Forest Service Science Consistency Review Team. It appears to come from the Nature Conservancy expert. Can you give me that? It's page 11 in your blue brief. Okay. And it's ER6 colon 1485. 6-18-45. 1485. And finally, halfway through, I quit looking these things up. I found it so frustrating. Well, that's very troubling to me, Your Honor, because our credibility relies upon being able to cite the court to exactly that. Yeah. Okay. Thanks. And I might have misunderstood, but it looked to me as it was coming, that that was a quotation from something from the Nature Conservancy. Thank you, counsel. Case just argued will be submitted. Court will stand in recess for the day. Thank you.
judges: Reinhardt, Fletcher W. , Smith N. R.